# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| ) | | |
| KARL KENDALL, SUZANNE RAINEY and VINCENZO PERNICE, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) ) | **CIVIL ACTION NO.**: |
| | ) | |
| PHARMACEUTICAL PRODUCT DEVELOPMENT, LLC, BOARD OF DIRECTORS OF PHARMACEUTICAL PRODUCT DEVELOPMENT, LLC, THE BENEFITS ADMINISTRATIVE COMMITTEE, and JOHN DOES 1-30. Defendants. | ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** |
| | ) | |

## COMPLAINT

Plaintiffs, Karl Kendall, Suzanne Rainey and Vincenzo Pernice ("Plaintiffs"), by and through their attorneys, on behalf of the Pharmaceutical Product Development, LLC Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Pharmaceutical Product Development, LLC ("PPD" or "Company"), the Board of Directors of PPD ("Board") and its members during the Class Period

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

and the Benefits Administrative Committee and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2. Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3. In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5. At all times during the Class Period (defined below) the Plan had at least half a billion in assets under management. At the end of 2017 and 2018, the Plan had over 700 million dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (April 15, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**<u>Plaintiffs</u>**

13.    Plaintiff, Karl Kendall ("Kendall"), resides in Huber Heights, Ohio.  During his employment, Plaintiff Kendall participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

14.    Plaintiff, Vincenzo Pernice ("Pernice"), resides in Tabernacle, New Jersey.  During his employment, Plaintiff Pernice participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

15.     Plaintiff, Suzanne Rainey ("Rainey"), resides in Richmond, Virginia.  During her employment, Plaintiff Rainey participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review the Committee meeting minutes (to the extent they exist) or other

evidence of Defendants' fiduciary decision making, or the lack thereof.[2] For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

18.     PPD is the Plan sponsor with a principal place of business being 929 North Front Street, Wilmington, NC 28401.  *See,* 2018 Form 5500 at 1.

19.     PPD describes itself as "a leading global contract research organization providing comprehensive, integrated drug development, laboratory and lifecycle management services. Our clients and partners include pharmaceutical, biotechnology, medical device, academic and government organizations. With offices in 46 countries and approximately 23,000 professionals worldwide"[3]

20.     The Company is a fiduciary for several reasons.  First, it is identified as a "Fiduciary" under the Plan's investment policy.  *See* Investment Policy Statement ("IPS") at 4. Second, it had responsibility for management of Plan assets.  The IPS states "the Company, as Fiduciary, will select the array of investment options to be made available for participant investment, and then provide on-going oversight of those investment options."  IPS at 4.

21.     Third, the Company appointed other Plan fiduciaries and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

---

[2] Several weeks prior to filing the instant lawsuit, Plaintiffs requested pursuant to ERISA §104(b)(4) that the Plan administrator produce several Plan governing documents, including any meeting minutes of the relevant Plan investment committee(s).  Their request for meeting minutes was denied for, among other reasons, that the request went beyond the scope of Section 104(b)(4). *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

[3] https://www.ppdi.com/careers/about#Global-Reach

22.    In particular, PPD "designated the following person or persons to take on the responsibilities of Plan Administrator. … [t]he Benefits Administrative Committee." *See,* Summary Plan Description at page 3.  In addition, PPD established a trust to hold all amounts contributed to the Plan by the Plan Trustee in a qualified Trust.  "The trust established on behalf of the Plan will be the funding medium used for the accumulation of assets from which Plan benefits will be distributed." *Id.*  As of January 1, 2020, the Trustee was a nondiscretionary Trustee and was only able to "invest Plan assets as directed by the Plan Administrator, the Employer, an Investment Manager or other Named Fiduciary or, to the extent authorized under the Plan, a Plan Participant." *See,* Plan Adoption Agreement at page 54.  It is believed and, therefore, averred that Trustees duties may have changed from time to time during the Class Period.

23.    Lastly, the Company acted through its officers, including the Board and Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

24.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

25.    The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including monitoring the activities of the Committee. "The Benefits Administrative Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reports to the Company's Board of Directors." *See,* 2018 Form 5500 filing at page 5 of the attached audited financial statement. "The Benefits Administration Committee …was established by the Compensation Committee of the Board of Directors … of Pharmaceutical Product Development, LLC…. The purpose of the [Benefits Administration Committee] is to assist the Committee in the discharge of its responsibilities

7

relating to the oversight and administration of the Company's employee benefits plans and programs. *See,* the Trustee Declaration which is an Exhibit to the Investment Policy Statement.

26.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

27.     The unnamed members of the Board of Directors for PPD during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

28.     The Committee had discretionary authority to select, and accordingly, the fiduciary duty to prudently select and monitor Plan investments.  "The Benefits Administrative Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reports to the Company's Board of Directors." *See,* 2018 Form 5500 filing at page 5 of the attached audited financial statement.

29.     "The Benefits Administration Committee …was established by the Compensation Committee of the Board of Directors … of Pharmaceutical Product Development, LLC…. The purpose of the [Benefits Administration Committee] is to assist the Committee in the discharge of its responsibilities relating to the oversight and administration of the Company's employee benefits plans and programs. *See,* the Trustee Declaration which is an Exhibit to the Investment Policy Statement.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

31.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

32.     To the extent that there are additional officers, employees and/are contractors of PPD who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, PPD officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.     THE PLAN

33.     PPD "has adopted the Pharmaceutical Product Development, LLC Retirement Savings Plan to help its employees save for retirement." PPD Corporation 401(k) Savings Plan Summary Plan Description, Effective January 1, 2020 ("SPD") at 1.

34.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

*Eligibility*

35.     In general, regular full-time employees are eligible to participate in the Plan "as of the first Entry Date following [their] date of employment." SPD at 8. Entry Date is defined as "the first day of the month coinciding with or next following the date" you become a regular full-time employee. SPD at 8.

*Contributions*

36.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. SPD at 4.

37.     With regard to employee contributions, "[p]articipants may contribute up to 50% of pretax annual compensation, as defined in the Plan." Notes to Financial Statements, December 31, 2018 ("Financial Statement") at 5.

38.     PPD "contributes an amount equal to 50% of the participants contribution not to exceed 6% of compensation." *Id.*

39.     Like other companies that sponsor 401(k) plans for their employees, PPD enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

40.     PPD also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

41.     Given the size of the Plan, PPD likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

42.     A participant is 100 percent vested at all times in their contributions plus actual earnings thereon.  Financial Statement at 5.

*The Plan's Investments*

43.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, "a participant may direct all contributions to selected investments as made available and determined by the Plan Administrator in 1% increments." *Id.* As noted above, the Committee, selects the investment funds that the Plan participants invest in. *See,* 2018 Form 5500 filing at page 5 of the attached audited financial statement.

44.     The Plan specifically permitted investments in collective trusts.  In particular, it stated "Plan assets may also be invested in a common/collective trust fund, or in a group trust fund that satisfies the requirements of IRS Revenue Ruling 81-100." Basic Plan Document at 110.

45.     The Plan's assets under management for all funds as of December 31, 2018 was over $700,000,000. *Id.* at 4.

*Payment of Plan Expenses*

46.     As a first resort, Plan assets were or are used to pay for all expenses incurred by the Plan, including recordkeeping fees. PPD established a trust to hold all amounts contributed to the Plan by the Plan Trustee in a qualified Trust. "The trust established on behalf of the Plan will be the funding medium used for the accumulation of assets from which Plan benefits will be distributed." *See,* Summary Plan Description at page 3. The Trustee, Reliance Trust Company, is empowered to pay all Plan expenses. "All reasonable expenses related to plan administration will be paid from Plan assets…. For this purpose, Plan expenses include, but are not limited to, all

reasonable costs, charges and expenses incurred by the Trustee in connection with the administration of the Trust…." *Id.*

## V.    CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 15, 2014 through the date of judgment (the "Class Period").

48.    The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 9,103 Plan "participants with account balances as of the end of the plan year."  *See*, the PPD 2018 Form 5500 at p. 2.

49.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

50.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are fiduciaries of the Plan;

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B.      Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.      Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

51.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

52.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

53.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI. DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

54.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

55.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

56.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

Case 5:20-cv-00157-D   Document 1   Filed 04/15/20   Page 14 of 49

57. As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

58. The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

59. In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

60. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

61.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

62.    During the Class Period, Defendants did not act in the best interests of the Plan participants. Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

63.    Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's

investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period and (2) lower recordkeeping and administrative fees.

64.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

### A.    Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

65.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

66.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to

higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

67.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

68.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See "A Look at 401(k) Plan Fees," supra.*

69.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

70.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio…We place funds in a given category based on their

portfolio statistics and compositions over the past three years." *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[5]

71.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

72.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

73.     The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

---

[5] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7. These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

74. The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[6]

**FIGURE 7**
**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

*Id.* at 12.

75. Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B. Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

---

[6] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management. Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

76.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 135 S. Ct. at 1823.  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."  *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

77.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

78.     When large plans, particularly those with nearly a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

79.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

80.    During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

81.    The funds in the Plan have stayed relatively unchanged since 2014.  Taking 2018 as an example year, the majority of funds in the Plan (at least 13 out of 21 or more than 60%) were much more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets).  The expense ratios for funds in the Plan in some cases were up to *127%* (in the case of the PIMCO Real Return Inst'l – Domestic Bond Fund) above the median expense ratios in the same category: [7]

| Fund | ER[8] | Category | ICI Median Fee[9] |
| --- | --- | --- | --- |
| PIMCO Real Return Instl | 0.98% | Domestic Bond | 0.43% |
| Fidelity Freedom 2035 | 0.73% | Target Date Fund | 0.65% |
| Fidelity Freedom 2040 | 0.75% | Target Date Fund | 0.65% |
| Fidelity Freedom 2045 | 0.75% | Target Date Fund | 0.65% |
| Fidelity Freedom 2045 | 0.75% | Target Date Fund | 0.65% |

---

[7] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study") available at *https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf*

[8]  The listed expense figures are taken from the most recent available summary prospectuses published in 2018.

[9] This median fee is taken from plans with $500m to $1b in assets.

| Fund | ER[8] | Category | ICI Median Fee[9] |
|---|---|---|---|
| Fidelity Freedom 2050 | 0.75% | Target Date Fund | 0.65% |
| Fidelity Freedom 2050 | 0.75% | Target Date Fund | 0.65% |
| Fidelity Freedom 2055 | 0.75% | Target Date Fund | 0.65% |
| Hartford International Opportunities Y | 0.76% | Int'l Equity | 0.53% |
| JPMorgan Core Bond R6 | 0.35% | Domestic Bond | 0.43% |
| PIMCO Real Return Instl | 0.98% | Domestic Bond | 0.43% |
| MFS Total Return R4 | 0.49% | Non-target date balanced | 0.34% |
| JPMorgan Small Cap Equity R5 | 0.80% | Domestic Equity | 0.43% |
| MassMutual Select Mid Cap Growth I | 0.71% | Domestic Equity | 0.43% |
| Victory Sycamore Small Company Opp I | 0.88% | Domestic Equity | 0.43% |

82. The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period. That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years. Accordingly, the median expense ratios in 2018 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2018 expense ratios utilized in the

above chart for the Plan's current funds and the median expense ratios in the same category.

83.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

*Failure to Utilize Lower Fee Share Classes*

84.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

85.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

86.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share

classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

87.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2018 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund Option | Fund Assets | Net Expense Ratio | Identical Lower Share Class | Identical Lower Cost Fund ER | Excess Expense |
|---|---|---|---|---|---|
| FFFFX Fidelity Freedom 2040 | $45,167,311 | 0.75 % | FSNVX Fidelity Freedom 2040 K | 0.65 % | 15.38% |
| FFFEX Fidelity Freedom 2030 | $38,386,840 | 0.69 % | FSNQX Fidelity Freedom 2030 K | 0.60 % | 15.00% |
| FFFHX Fidelity Freedom 2050 | $22,403,229 | 0.75 % | FNSBX Fidelity Freedom 2050 K | 0.65 % | 15.38% |
| FFFGX Fidelity Freedom 2045 | $15,477,046 | 0.75 % | FSNZX Fidelity Freedom 2045 K | 0.65 % | 15.38% |
| FFFDX Fidelity Freedom 2020 | $15,394,192 | 0.60 % | FSNOX Fidelity Freedom 2020 K | 0.53 % | 13.21% |
| FFTHX Fidelity Freedom 2035 | $14,969,537 | 0.73 % | FSNUX Fidelity Freedom 2035 K | 0.63 % | 15.87% |
| FDEEX Fidelity Freedom 2055 | $12,236,349 | 0.75 % | FNSDX Fidelity Freedom 2055 K | 0.65 % | 15.38% |
| FFFCX Fidelity Freedom 2010 | $5,559,655 | 0.52 % | FSNKX Fidelity Freedom 2010 K | 0.46 % | 13.04% |
| FFTWX Fidelity Freedom 2025 | $4,404,269 | 0.65 % | FSNPX Fidelity Freedom 2025 K | 0.56 % | 16.07% |

| | | | | | |
|---|---|---|---|---|---|
| FFVFX Fidelity Freedom 2015 | $715,028 | 0.56 % | FSNLX Fidelity Freedom 2015 K | 0.49 % | 14.29% |
| MSFJX MFS Total Return R4 | $66,418,732 | 0.49 % | MSFKX MFS Total Return R6 | 0.40 % | 22.50% |
| HAOYX Hartford International Opportunities Y | $36,507,752 | 0.76 % | IHOVX Hartford International Opportunities R6 | 0.71 % | 7.04% |

88.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

89.     Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).  The assets under management for each fund ranged from $27m to $92m thus easily qualifying them for lower share classes.  The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| American Funds-Investment Co. of America | $64.1m |
| Fidelity Freedom 2040 Fund | $45.1m |

| Fund in Plan | 2018 Assets Under Management |
|---|---|
| Hartford International Opportunities Y | $36.5m |
| JPMorgan Small Cap Equity Fund | $49.1m |
| JPMorgan Core Bond | $27.0m |
| MFS Total Return Fund | $66.4m |
| MFS Mid Cap Value | $38.4m |
| MFS Growth Fund | $62.6m |
| Vanguard Institutional Index Fund | $91.9m |

90.     Additionally, most of the lower share alternatives were available prior to the start of the Class Period.   By August 2017, all the lower share alternatives were available.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the

cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

91.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

92.    It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs. *Tibble*, 2017 WL 3523737, at * 8. Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11. This basic tenet of good fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below. A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

93.    By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

***Failure to Investigate Availability of Lower Cost Collective Trusts and Separate Accounts***

94.    Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds, which are pooled investment products.

95.    As noted *supra*, ERISA is derived from trust law. *Tibble*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the

selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.* (emphasis added).

96.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

97.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

98.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[10] Indeed, as of 2012, among plans over $1 billion in size, more assets were

_____

[10] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result,

held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

99.    Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

100.    Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

101.    Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee

---

participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

102.    Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.  As relevant in this case, Fidelity offered collective trust formats for its "Freedom" index and blend target-date funds during the Class Period.

103.    Here in particular, there were no limitations on using collective trusts.  The Plan Document stated "Plan assets may also be invested in a common/collective trust fund, or in a group trust fund that satisfies the requirements of IRS Revenue Ruling 81-100."  Basic Plan Document at 110.   The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts and/or separate accounts in the same investment style of mutual funds in the Plan.  Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts, but Defendants again failed to investigate this option.

104.    In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts or separate accounts,  Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

105.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

106.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available    at    https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

107.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

108.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  A reasonable investigation would have revealed the existence of these lower-cost alternatives.  The

chart below uses 2018 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Fund | ER | Category | Alternative Fund Index / Managed | Alternative 2018 ER | % Fee Excess |
|---|---|---|---|---|---|
| American Funds Europacific Growth R6 | 0.49 % | Int'l Equity | Vanguard Intl Growth Adm | 0.32% | 53% |
| -- | -- | | -- | -- | -- |
| | | | | | |
| American Funds Invmt Co of Amer R6 | 0.29 % | Domestic Equity | Vanguard 500 Index Admiral / | 0.04% | 1,350% |
| | | | Vanguard Growth & Income | 0.23% | 26% |
| | | | | | |
| Fidelity Freedom 2010 | 0.52 % | Target Date Fund | Fidelity Freedom® Index 2010 Investor/ | 0.12 % | 333% |
| | | | American Funds Trgt Date Retirement  2010 R6 | 0.33 % | 57% |
| | | | | | |
| Fidelity Freedom 2015 | 0.56 % | Target Date Fund | Fidelity Freedom® Index 2015 Investor/ | 0.12 % | 366% |
| | | | American Funds Trgt Date Retirement  2015 R6 | 0.33 % | 70% |
| | | | | | |
| Fidelity Freedom 2020 | 0.60 % | Target Date Fund | Fidelity Freedom® Index 2020 Investor/ | 0.12 % | 400% |
| | | | American Funds Trgt Date Retirement  2020 R6 | 0.34 % | 76% |
| | | | | | |
| Fidelity Freedom 2025 | 0.65 % | Target Date Fund | Fidelity Freedom® Index 2025 Investor/ | 0.12 % | 441% |
| | | | American Funds Trgt Date Retirement 2025 R6 | 0.36 % | 81% |
| | | | | | |
| Fidelity Freedom 2030 | 0.69 % | Target Date Fund | Fidelity Freedom® Index 2030 Investor/ | 0.12 % | 475% |
| | | | American Funds Trgt Date Retirement 2030 R6 | 0.38 % | 81% |

| Fund | ER | Category | Alternative Fund Index / Managed | Alternative 2018 ER | % Fee Excess |
|---|---|---|---|---|---|
| | | | | | |
| Fidelity Freedom 2035 | 0.73 % | Target Date Fund | Fidelity Freedom® Index 2035 Investor/ | 0.12 % | 508% |
| | | | American Funds Trgt Date Retirement 2035 R6 | 0.39 % | 87% |
| | | | | | |
| Fidelity Freedom 2040 | 0.75 % | Target Date Fund | Fidelity Freedom® Index 2040 Investor/ | 0.12 % | 525% |
| | | | American Funds Trgt Date Retirement 2040 R6 | 0.40 % | 87% |
| | | | | | |
| Fidelity Freedom 2045 | 0.75 % | Target Date Fund | Fidelity Freedom® Index 2045 Investor/ | 0.12 % | 525% |
| | | | American Funds Trgt Date Retirement 2045 R6 | 0.40 % | 88% |
| | | | | | |
| Fidelity Freedom 2050 | 0.75 % | Target Date Fund | Fidelity Freedom® Index 2050 Investor/ | 0.12 % | 525% |
| | | | American Funds Trgt Date Retirement 2050 R6 | 0.41 % | 82% |
| | | | | | |
| Fidelity Freedom 2055 | 0.75 % | Target Date Fund | Fidelity Freedom® Index 2055 Investor/ | 0.12 % | 525% |
| | | | American Funds Trgt Date Retirement 2055 R6 | 0.42 % | 79% |
| | | | | | |
| Hartford International Opportunities Y | 0.76 % | Int'l Equity | Fidelity International Index/ | 0.04% | 1,800% |
| | | | Elfun International Equity | 0.36% | 111% |
| | | | | | |
| JPMorgan Core Bond R6 | 0.35 % | Domestic Bond | Vanguard Interm-term Bond Index/ | 0.07% | 400% |
| | | | Johnson Institutional Core Bond | 0.25 % | 40% |
| | | | | | |
| JPMorgan Small Cap Equity R5 | 0.80 % | Domestic Equity | -- | -- | -- |
| | | | Vanguard Explorer | 0.46% | 73% |

| Fund | ER | Category | Alternative Fund Index / Managed | Alternative 2018 ER | % Fee Excess |
|---|---|---|---|---|---|
| | | | | | |
| MassMutual Select Mid Cap Growth I | 0.71 % | Domestic Equity | Vanguard Mid-Cap Growth Index Admiral/ | 0.07% | 914% |
| | | | Fidelity Growth Strategies K | 0.46% | 54% |
| | | | | | |
| MFS Growth R6 | 0.58 % | Domestic Equity | Vanguard Russell 1000 Growth Index I/ | 0.07% | 728% |
| | | | Fidelity Advisor Series Growth Opps | 0.01% | 7,000% |
| | | | | | |
| MFS Mid Cap Value R6 | 0.69 % | Domestic Equity | -- | -- | -- |
| | | | Fidelity Low-priced Stock | 0.43% | 60% |
| | | | | | |
| MFS Total Return R4 | 0.49 % | Non-target date balanced | State Farm Balanced/ | 0.13% | 276% |
| | | | Vanguard Balanced Index I | 0.06 % | 716% |
| | | | | | |
| PIMCO Real Return Instl | 0.98 % | Domestic Bond | Fidelity® Inflation-Prot Bd Index/ | 0.05% | 1,860% |
| | | | Vanguard Inflation-protected Securities ADM | 0.10% | 880% |

109.     The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

110.     Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.   As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term.  With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.  Comparing the five-year returns of some of the Plan's actively

managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in performance. The chart below indicates the efficiency of the active funds or lack thereof (*i.e.*, the return needed by the actively managed fund to match the returns of the passively managed fund):

| Fund Name/ Comparator | Expense Ratio[11] | Return (5 Year) | Return Deficiency |
|---|---|---|---|
| MFS Total Return R4 (MSFJX)/ | 0.48 | 2.96 | Fails Efficiency Requires 2.01% more return to pass |
| Vanguard Balanced Index I (VBAIX) | 0.06 | 4.53 | |
| | | | |
| American Funds-Investment Company of America R6 (RICGX)/ | 0.27 | 4.51 | Fails Efficiency Requires 1.41% more return to pass |
| Vanguard 500 Index Admiral (VFIAX) | 0.04 | 5.9 | |
| | | | |
| Fidelity Freedom 2040 (FFFFX)/ | 0.75 | 3.78 | Fails Efficiency Requires 1.60% more return to pass |
| Fidelity Freedom Index 2040 Investor (FBIFX) | 0.11 | 4.6 | |
| | | | |
| Hartford International Opportunities Y (HAOYX)/ | 0.77 | -0.39 | Fails Efficiency Requires 0.98% more return to pass |
| Fidelity International Index (FSPSX) | 0.035 | -0.37 | |
| | | | |
| Fidelity Freedom 2030 (FFFEX)/ | 0.69 | 4.18 | Fails Efficiency Requires 1.41% more return to pass |
| Fidelity Freedom Index 2030 Investor (FXIFX) | 0.12 | 4.87 | |
| | | | |
| Fidelity Freedom 2050 (FFFHX)/ | 0.75 | 3.78 | Fails Efficiency Requires 1.59% more return to pass |
| Fidelity Freedom Index 2050 Investor (FIPFX) | 0.12 | 4.60 | |

111. The comparator funds above belong to the same peer group as the Plan fund. Comparing funds in the same peer group is an industry-standard that allows comparisons to be "apples to apples." Here, the following data points were used to calculate the Plan fund's

---

[11] Expense ratios are as of January 2020.

efficiency: r-squared, standard deviation, and 5-year return. The same data points were used on both the active and passive funds to calculate the incremental cost and incremental return and then to determine if the active fund is efficient, less than efficient, or fails efficiency.

112. Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

## C.      Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses

113. The Plan's recordkeeper during the Class Period was Massachusetts Mutual Life Insurance Company ("Mass Mutual"). SPD at 21. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[12] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

---

[12] Qualified Domestic Relations Order.

114. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

115. On overage, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf

116. The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

117. Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

118. Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard,

"Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

119. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable"). First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

120. Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

121. Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown

significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

122. Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to undertake any of the aforementioned steps because, among other things, there is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was astronomical.

123. According to data compiled in the 20th edition of the *401k Averages Book*, for plans with 2,000 participants and $200 million in assets (a fraction the size of the Plan), the **average** recordkeeping/administration fee (through direct compensation), based on data obtained in 2019, was $5 per participant. *See* Pension Data Source, *401k Averages Book* at 107 (20th ed. 2020) (data updated through September 30, 2019).[13] Expressed as a range, $0 per participant is at the low end and $43 per participant is at the high end. *Id.* As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan. However, the indirect compensation received by Mass Mutual for recordkeeping services is impossible to pinpoint using publicly available information given that "revenue sharing' is divvied among all the plan's service providers which "***could include but are not limited*** to

---

[13] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at 2.

recordkeepers, advisors and platform providers." *Id.* at p. 7, Answer to FAQ No. 14 (emphasis added).[14]

124. Nonetheless, the Plan's recordkeeping costs were at all times well above the $5 average cost per participant of plans that were a fraction of its size in terms of assets under management. The Plan's direct compensation recordkeeping costs (and overall recordkeeping costs) should have been much lower given its size.

125. To place this in context, recordkeeping costs drop as a plan increases in size. So for example, a plan with 200 participants and $20m in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant with $190 at the high end. *401k Averages Book* at 95. A plan with 1,000 participants and $100m in assets has an average recordkeeping and administration cost (through direct compensation) of $6 per participant. *401k Averages Book* at 103.

126. A 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grow, a plan can negotiate lower recordkeeping fees:[15]

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

---

[14] *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

[15] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf. Given the general trend of decreasing recordkeeping fees, the average costs per participants from ***nearly 20 years ago*** cited in the DOL study would be much lower today as reflected in the latest edition of the *401k Averages Book*.

127.     Additionally, as plan asset size increases, so should the costs per participant decrease.  *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.")

128.     Here, the Plan averaged around $20 per participant in direct fees paid to the recordkeeper between 2014 and 2018, well above the average of plans a fraction of its size. Moreover, if all the indirect revenue sharing reported on the Plan's form 5500 (or even a fraction of it)[16] were paid to the recordkeeper, then prior to any rebates, the per participant recordkeeping fee would have ranged from $54 to $143 during the Class Period.  These amounts are clearly unreasonable as they are well above recognized reasonable rates.[17]

129.     Even though the Defendants claim to have paid back a certain amount of revenue sharing back into the Plan, a review of the Plaintiffs' account statements fails to show that any of those amounts were added back directly to each Plaintiffs' retirement accounts. *See,* 2018 Form

---

[16]  The Plan reported the following revenue sharing payments during the Class Period:

| 2018 | $ | 679,914.00 |
|------|---|------------|
| 2017 | $ | 638,293.00 |
| 2016 | $ | 630,964.00 |
| 2015 | $ | 595,758.00 |
| 2014 | $ | 395,953.00 |

[17] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

5500 filing at page 6 of the attached audited financial statement. Therefore, it's alleged and averred that any amounts paid back into the Plan by the Defendants simply went to paying additional excessive fees and should not be considered to have reduced the excessive costs charged to Plan participants. However, even if those amounts could be considered a reduction of the Plan's excessive costs, the costs are still excessive as discussed above.

130.     Given the size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services at a lower cost that were comparable to or superior to the typical services provided by the Plan's recordkeeper.

131.     A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee)

132.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.     At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

134.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and

acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

135. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost. Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

136. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

137. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

138. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against PPD and the Board Defendants)

139. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

140. PPD and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

141. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

142. The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

143. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

144.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

145.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

145.    **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Dated:  April 15, 2020

Respectfully submitted,
**MATHESON & ASSOCIATES, PLLC**

/s/ John Szymankiewicz              .
John Szymankiewicz
NC Attorney ID # 41623
127 West Hargett Street, Suite 100
Raleigh, NC 27601
(919) 335-5291
Fax (919) 516-0686
Local Civil Rule 83.1 Counsel for Plaintiffs

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey              .
Donald R. Reavey, Esquire
(*Notice of Special Appearance to be Filed*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID #88587
(*Notice of Special Appearance to be Filed*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class